Filed 5/13/15  Dalia C. v. Super. Ct. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DALIA C., | D067483 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. NJ14956A-B) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |


ORIGINAL PROCEEDINGS in mandate.  Michael J. Imhoff, Commissioner.

Petition denied.


Dependency Legal Group of San Diego and Amanda J. Gonzales for Petitioner.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dalia C. petitions for extraordinary writ relief (Cal. Rules of Court, rule 8.452), requesting that we set aside the juvenile court's order setting a permanency plan hearing under Welfare and Institutions Code section 366.26.[1] She challenges the sufficiency of the evidence to support the court's jurisdictional findings as to her young twins, daughter L.C. and son Carlos C., and its denial of reunification services. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2014, L.C. and Carlos were born to Dalia and her husband, Juan C.[2] At the time, Dalia was 19 years old and Juan was 20 years old and a United States Marine; they had been together for several years. In July, they moved out of the maternal grandmother's home and into their own apartment.

L.C. was a fussier baby than Carlos. On August 10, 2014, L.C. was in the exclusive care of her parents. That afternoon, she was rushed by ambulance to the emergency room after she began having seizures. An examination revealed severe injuries, including acute and chronic subdural hematomas and bilateral retinal hemorrhaging "consistent with abusive head trauma." L.C. had only "a small amount of

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]     Juan has not petitioned for any relief.

2

living brain tissue" remaining, and she will likely "never be able to walk, talk, eat, and [will] have very little eye sight, if any."

The Agency filed dependency petitions on behalf of the twins. Carlos was placed in foster care. L.C. was initially in a pediatric intensive care unit, and then she was moved to foster care.

As to the older injuries, the parents claimed that about a month earlier, when Juan was home alone with the babies, a plastic mobile on the side of L.C.'s crib fell on her and bruised the side of her head. Juan surmised the incident gave L.C. a headache because subsequently she "would cry a lot with any noise." Juan also claimed that on August 8, he was bathing her in a plastic tub and "she was crying and moving around a lot," and she hit her head on the back of the tub.

As to the newer injuries, Juan reported that on August 10, L.C. began crying "dramatically." He tried to feed her, but she refused a bottle. He tried to comfort her, but she was inconsolable. She was "hot and red" from "crying so loud," so Juan decided to sit with her in his vehicle with the air conditioning running. He put L.C. on his shoulder and patted her back, and she quit crying. However, she resumed crying after she "threw her head back and came back forward," bumping her head on his shoulder. She then became "really stiff" and had difficulty breathing.

Dalia denied any knowledge of how L.C. was injured. She reported that on August 10, Juan was outside with the baby for approximately 15 to 30 minutes. She said Juan "gets impatient at times, but usually hands the babies over to me." She refused to believe he could have hurt L.C., or that she even suffered a traumatic brain injury on

3

August 10. Dalia believed "the mobile falling on [L.C.'s] head caused some bleeding in the brain," which caused some unknown preexisting condition to worsen. She revealed that after the mobile incident she and Juan took L.C. to the hospital for "fever and vomiting," but they did not tell the doctors about the mobile striking her.

A child abuse expert with the military, Dr. Sarah Villarroel, advised the San Diego County Health and Human Services Agency (Agency) that L.C.'s injuries were consistent with child abuse, and the parents "have not provided any history that could account for [her] injuries." Dr. Villarroel rejected the notion that the mobile injured L.C. The medical team explained that to have caused the injuries, "the object would have to have been more like a television dropping on her head."

Dalia was apprised of Dr. Villarroel's opinion, but she steadfastly refused to consider that Juan may be culpable. Throughout the proceedings, the parents suggested the paternal stepgrandfather may have harmed L.C. when the paternal grandmother was babysitting. Dalia told the social worker she dreamed she saw the grandfather shaking L.C., and "this is a sign about what truly happened." Dalia visited a psychic "and learned that this is the truth."

After several continuances, the contested jurisdiction and disposition hearing was scheduled for January 26, 2015. On January 9, Juan was arrested on numerous child abuse charges. He ultimately confessed to the police that he shook L.C. "from side to side in frustration." After he confessed, he telephoned Dalia in the presence of detectives. He told her "to remember the promise he made her; that he would do whatever he needed to do so they wouldn't lose the kids." He told her, "That's what I

4

did."  He did not tell her he abused L.C.  To the contrary, he denied doing so.

The social worker told Dalia about Juan's confession to the police.  Dalia met with her therapist, and reported "she was confused about [Juan] admitting to [the] crime because he had told her previously that if things go downhill he would say that he did it so that she can get the babies back."  Dalia continued to believe in Juan's innocence.  The therapist advised the social worker that Dalia's "**deep denial and protectiveness of her husband are blocking her ability to make any progress with regards to being able to protect her children and understand the protective issue.  It is unlikely that [she] will benefit from treatment as long as she maintains this position.**"

At the January 26 hearing, the Agency submitted a letter Dalia gave the social worker a few days earlier.  The social worker testified that Dalia's therapist had been frustrated with Dalia's denial.  The therapist asked the social worker "what would be helpful," and the social worker advised the therapist to have Dalia engage in an exercise "where she sits down and looks for red flags."

In the letter, Dalia wrote that there were "[r]ed flags" she missed pertaining to Juan's conduct, such as "his irresponsible and impulsive behavior.  His cheating, lying and alcohol use."  The letter states, "I shouldn't have trusted him so much with our children knowing these behaviors.  Maybe if I demanded him to give her to me the day her injuries happened, instead of letting him try to calm her down that never would have happened."  She also wrote, "I admit I did wrong in not believing the doctors, in believing everything Juan said and being stuck with the theory that it had to be something else because of that but I see things clearly now. . . ."

5

Further, shortly before the hearing Dalia told the social worker "she now knows she was 'blind' to the father's behaviors and she now thinks that the first time she took [L.C.] to the hospital [after the reported mobile incident] was probably a result of her having left the father alone with the children while she . . . went to work. [Dalia] stated that she wishes she had considered all the behaviors she had seen from the father because if she had been honest with herself she never would have left the father with the responsibility of caring for the children. . . . [Dalia] said that she believes the father made up 'the mobile story' . . . and that he probably said that to cover up for the fact that he already caused [L.C.'s] injuries."

Dalia argued there was no longer any protective issue, and thus the twins were not subject to the court's jurisdiction. She claimed that "[s]he, like a good spouse, believed her husband [when] he repeatedly said he did not do it," but she now "wanted nothing to do with him" and was "contemplating divorce." She pointed out that Juan "is out of the picture and will be out of the picture for quite some time."

The Agency disagreed. The social worker testified reunification services for Dalia would not decrease the risk to the twins, because she "spent five months protecting the person who practically killed her child. She did not waver regarding every medical expert, police, therapists, doctors, [and] family." Further, the social worker testified the denial of services would not be detrimental to the twins given their age, their lack of attachment to Dalia, and her lack of progress in services already provided, including therapy. Dalia presented no countervailing evidence.

6

The court made true findings on the petitions, declared the twins dependents of the court, removed custody from the parents, and denied them reunification services. All findings were made by clear and convincing evidence.

The court explained Dalia "cannot separate herself from the responsibility of what happened to [L.C.]" The court noted that after the supposed mobile incident, the parents took L.C. to the hospital, but "the explanation of the mobile falling on her head was not shared with medical personnel." It also noted that even after Juan confessed to the police, Dalia did not "become aligned with her daughter." Rather, she clung to the "romanticized chivalrous notion" that he confessed only to protect her. She told her therapist he was innocent and confessed so she could obtain custody of the twins, a line he gave her on the phone. She would not believe he was responsible unless he told *her* so. The court noted that Dalia's letter "may be a step towards the cathartic moment, but it does not represent the cathartic moment." The court was more persuaded by Dalia's months' long denial that Juan could have harmed L.C.[3]

### DISCUSSION

### I

*Jurisdiction*

Dalia challenges the sufficiency of the evidence to support the court's true findings on the petitions. A dependency proceeding is essentially a bifurcated proceeding, in

---

[3] The twins' trial counsel agreed Dalia should be denied reunification services. Counsel argued they remained at risk, because she only recently realized L.C.'s injuries were caused by Juan rather than by "some other preexisting condition."

7

which the court must first determine whether the minor is within any of the descriptions set forth in section 300 and thus subject to its jurisdiction. (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 724.)

L.C.'s petition was based on section 300, subdivision (e), which applies when the "child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." Carlos's petition was based on subdivision (j) of section 300, which applies when the "child's sibling has been abused or neglected, as defined in subdivision . . . (e) . . . and there is a substantial risk that the child will be abused or neglected. . . ."

A jurisdictional finding need only be made under the preponderance of evidence standard. (§ 355, subd. (a); *In re A.E.* (2014) 228 Cal.App.4th 820, 825.) That standard requires the court to find the existence of a fact is more probable than its nonexistence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 918.) Here, the court nonetheless made its jurisdictional findings under a clear and convincing evidence standard. "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.)

In any event, on appeal we review findings made under either standard under the substantial evidence standard. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216, fn. 4.) "Under this standard '[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's

8

orders, if possible.' " (*Id.* at p. 1216.) "The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Dalia does not dispute that jurisdiction was proper based on Juan's conduct. "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) Ordinarily, when jurisdiction is properly based on one parent's conduct, we decline to consider whether it was also properly based on the other parent's conduct. (*Ibid.*) "However, we may exercise our discretion to reach the merits of the other parent's jurisdictional challenge in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*Ibid.*) The Agency concedes the court's jurisdictional findings, as they pertain to Dalia's conduct, resulted in its denial of reunification services to her, and thus we should reach the merits.

Viewed in the light most favorable to the court's jurisdictional findings, we conclude the evidence amply supports them based in part on Dalia's conduct. We reject her assertion the evidence was insufficient to show she knew or should have known

9

L.C.'s injuries resulted from Juan's abuse.  As to L.C.'s older injuries, the court could reasonably infer Dalia did not believe Juan's story the bruise to L.C.'s head was caused by a plastic mobile, because neither parent reported that story when they took L.C. to the hospital after the incident.  The court stated it was "somewhat taken aback" by the parents' lack of reporting.  Further, even if Dalia initially believed Juan's mobile story, her own letter and comments to the social worker shortly before the hearing show she should have known better.  She conceded she was blind to Juan's conduct and should not have rejected the medical evidence that L.C.'s injuries were caused by abuse.  Dalia essentially admitted that at the least, she should have known Juan harmed L.C.

II

*Denial of Reunification Services*

A

Dalia also challenges the sufficiency of the evidence to support the court's denial of reunification services.  "There is a presumption in dependency cases that parents will receive reunification services.  [Citation.]  [In relevant part,] section 361.5, subdivision (a) directs the juvenile court to order services whenever a child is removed from the custody of his or her parent unless the case is within the enumerated exceptions in section 361.5, subdivision (b)."  (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95, italics omitted.)  Section 361.5, subdivision (b) is a legislative presumption "that it may be fruitless to provide reunification services under certain circumstances."  (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750.)

10

As to L.C., the court relied on subdivision (b)(5) of section 361.5, which provides that services need not be provided to a parent if the court finds, by clear and convincing evidence, that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent . . . ." Read together, section 300, subdivision (e) and section 361.5, subdivision (b)(5) permit denial of reunification services to a parent if he or she knew or reasonably should have known the other parent had abused the child. (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21; *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.) As to Carlos, the court relied on subdivision (b)(7) of section 361.5, which authorizes the court to deny services to a parent when he or she "is not receiving reunification services for a sibling" pursuant to subdivision (5) of section 361.5.

As discussed, viewing the evidence most favorably to the court's order, substantial evidence supports the finding Dalia knew, or reasonably should have known, that Juan physically abused L.C. about a month before the catastrophic August 10, 2014, incident. Further, overwhelming evidence supports a finding that during the five months preceding the jurisdiction and disposition hearing, Dalia knew, or reasonably should have known, that Juan caused L.C.'s August 10 injuries, yet she continued to deny his involvement. Again, her own letter and comments to the social worker shortly before the hearing show she should have known Juan was at fault, yet she continued to align herself with him, even after his arrest. As the court explained, Dalia's "deep denial and protectiveness of her husband are blocking her ability to make any progress with regards to being able to protect her children and understand the protective issue."

11

B

Alternatively, Dalia submits the court erred by not ordering reunification services under section 361.5, subdivision (c). That statute prohibits the court from ordering services when the child was brought within the court's jurisdiction under subdivision (e) of section 300, "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c).) While the social worker has an investigative duty under section 361.5, subdivision (c),[4] Dalia concedes the burden is on the parent to demonstrate services should be provided under that statute. (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163-164.)

"[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Dalia claims she met her burden of showing a parent-child bond would make the denial of reunification services detrimental, but she produced *no* evidence. Further, her

---

[4] "The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child." (§ 361.5, subd. (c).)

12

reliance on the Agency's evidence is unavailing. She cites the social worker's notations that she visited the twins and acted appropriately, but they do not indicate any bond. To the contrary, L.C. suffers from severe brain injuries, and one of the notations states that during a visit L.C. "did not make any noise" and "did not smile or respond to the mother or the foster mother's movement or touch." The entries Dalia cites pertaining to Carlos do not discuss his reaction to her. One of the entries states the "foster mother said that the children 'seem fine' when they are visiting with the mother . . . but they do not cry when the mother . . . leaves at the end of the visit." Another entry states it appeared Carlos may cry when the social worker took him from the *foster mother's daughter*.

Further, the entries noting *Dalia's* feelings—for instance "it would break my heart" not to regain custody, and it saddened her that the foster mother, rather than she, started Carlos on solid food—are immaterial to the services issue. The children's best interests are at stake, not Dalia's.

The twins were removed from Dalia's custody when they were only four months of age, and by the time of the disposition hearing they had been in foster care for five months. In the social worker's view, the denial of services would not be detrimental to the twins given their young age, their lack of attachment to Dalia, and her lack of progress in the months of therapy that had already been provided. (§ 361.5, subd. (c) [among other factors, court may consider parent's failure to respond to previous services].) Certainly, there is no evidence to support an order of services under section 361.5, subdivision (c) based on a close and positive relationship between Dalia and the twins.

13

Further, the social worker testified reunification services are not warranted on the ground they would prevent reabuse, because Dalia had not progressed during the twice or thrice weekly therapy sessions already provided. The letter Dalia provided the social worker at the 11th hour did not change her opinion, because Dalia "spent five months protecting the person who practically killed her child," despite overwhelming evidence of Juan's culpability. The court reasonably relied on the social worker's uncontradicted opinion. Dalia did not meet her burden of proof, and thus the court was not authorized to order services under subdivision (c) of section 361.5.[5]

## DISPOSITION

The petition is denied. The request for stay of the section 366.26 hearing is denied.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

---

[5] We reject Dalia's suggestion the court's order must be reversed because the court did not expressly address each of the six factors set forth in subdivision (i) of section 361.5, which apply in determining whether reunification services will benefit a child under subdivision (b)(7) of section 361.5 and pertain to Carlos. She has forfeited the issue by not citing any supporting legal authority. (*In re J.M.* (2012) 206 Cal.App.4th 375, 381.) Further, "[w]e presume the existence of every fact the trier of fact could reasonably deduce from the evidence." (*In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 322.)

14